SOUTHERN RAILWAY COMPANY, Petitioner-Appellee, v. FRANK G. CLEMENT, Governor, etc., et al., Respondents-Appellants.—415 S.W.(2d) 146.

Middle Section, at Nashville. November 25, 1966.

Certiorari Denied by Supreme Court May 15, 1967.

George F. McCanless, Attorney General, Milton P. Rice, Assistant Attorney General, Nashville, for appellants.

Clyde W. Key, Knoxville, Dawson Hall, Chattanooga, Harry W. Laughlin, Memphis, F. Clay Bailey, Jr., Douglas M. Fisher, Nashville, for appellee.

# I

## THE CASE

SHRIVER, J. This is an appeal from a decree of Part II of the Chancery Court at Nashville, sustaining petitions for certiorari and setting aside orders of the State Board of Equalization which denied the Southern Railway Company's petitions to have certain tax assessments of properties other than its own raised to one hundred percent (100%) of actual cash value.

In their statement of the case counsel for the State Board of Equalization say:

"These cases, consolidated for the purpose of trial and appeal, present the following questions:

(1) Whether appellee railroad's ad valorem property tax assessments for the biennium 1963-64 and the biennium 1965-66 were at less than actual cash value;

(2) Whether one whose properties are assessed at less than actual cash value has standing to maintain before a board of equalization or in the courts a petition to have the assessments of other properties raised to actual cash value; and

(3) Whether a board of equalization has the right to consider in a non-assessment year a petition by a taxpayer to equalize with his own assessment the assessments of real properties other than his own. (This question is relevant only to the petitions filed by appellee in the year 1964);

(4) Whether the State Board of Equalization has the authority to increase the assessment level in an entire county in the absence of notice to all affected property owners.''

## II

## THE FACTS

We will refer to the parties as they appeared in the Court below, to wit: appellee, Southern Railway Company, as ''Petitioner'' and the appellant, members of the State Board of Equalization, as ''Respondents''.

The facts are substantially as follows:

Petitioner, Southern Railway Company, does business and has properties subject to ad valorem taxation in twenty five (25) counties in Tennessee. These properties are assessed by the Tennessee Public Service Commission and the State Board of Equalization on a statewide basis and the assessment is then allocated to the respective counties in which the petitioner does business on the basis of the miles of track in said county, along with other factors as provided by statute.

Petitioner has properties located in Hawkins and Loudon Counties, said properties being assessed for ad valorem taxation in accordance with Chapter 9 of Title 67, T.C.A.

In 1964 and again in 1965 petitioner brought before the State Board of Equalization petitions to have the assessments of locally-assessed properties in Hawkins and Loudon Counties raised to 100% of actual cash value and petitions being appeals from denial of such relief by the respective County Boards of Equalization.

Respondents dismissed petitioner's appeals in each instance on the ground that petitioner failed to show that its properties were assessed at full cash value and because they felt they did not have a right to entertain petitions to equalize in a non-assessment year and, further because of the lack of notice to the affected property owners.

In petitioner's 1964 appeal there was filed a transcript of the proceedings before the Hawkins County Board of Equalization which includes the testimony of the Tax Assessor of that county to the effect that in assessing local properties he applied a ratio of ten percent of actual value as determined by a reappraisal of property conducted in 1958 and 1959 by James L. Jacobs, Engineers and Appraisers. Said transcript also includes the testimony of Mr. Donald Jackson, Executive Secretary of Tennessee Taxpayers Association, and of Mr. Winfield Hale, Jr., attorney for petitioner in Rogersville, Tennessee.

Mr. Hale stated that he had made a "Sales Ratio Study" comparing sales prices of properties sold in eight months of 1963 with assessed valuations thereof, and had determined therefrom the ratio in each case which the sale price bore to the assessed value, which information he forwarded to Mr. Jackson.

Mr. Jackson testified that he had deduced from Mr. Hale's information that the median ratio of assessed value to actual value in Hawkins County was nine percent (9%). He further stated that a similar study conducted by the Tennessee Taxpayers Association on behalf of the Tennessee Legislative Council in 1956 had shown a median ratio of eleven percent (11%).

Also filed as an exhibit to petitioner's 1964 appeal is a transcript of the proceedings before the Loudon County

Board of Equalization, which transcript contains testimony similar to that in the Hawkins County appeal, except that the Loudon County Tax Assessor did not appear.

Mr. John Gibson, local attorney for petitioner; stated that he had made a survey similar to the one made by Mr. Hale in Hawkins County and had conveyed the information thus gleaned to Mr. Jackson who then testified that he had deduced from such data that the median assessment ratio in Loudon County was ten percent (10%) of actual value.

At the State Board hearing of the 1964 appeal, Mr. Stanley White, Tax and Rate Consultant for the Tennessee Public Service Commission appeared and testified, describing in detail the formulation of the assessments made of petitioner's properties by the Commission in 1963. He testified that the Commission's assessment of the petitioner's properties in 1963 was $47,875,000.00 which was subsequently reduced by the State Board of Equalization to $44,750,000.00.

Mr. White testified that the Commission staff in making the assessment considered gross receipts, capital, market value of stocks, bonds and other securities, value of tangible property, and net operating income, thus arriving at an indicated system value for petitioner's properties of $664,797,558.00, which amount was reduced by the value of localized properties to $606,001,893.00 which was the indicated distributable value of the system. Certain apportionment factors were then applied so that the Commission staff arrived at an indicated Tennessee distributable property value of $82,854,153.00. To this figure, was then applied a ''safety factor'' thus arriving at an indicated property value of $59,778,717.00.

On the basis of "judgment" the Commission staff then reduced the above figure to $48,500,000.00 and recommended this to the Commission.

The Commission, after giving due consideration to the matter, and after a hearing, fixed the assessment of petitioner's properties in Tennessee at $47,875,000.00 which figure was subsequently reduced by the Board of Equalization to $44,750,000.00.

Counsel for Hawkins and Loudon Counties then called as a witness the Chairman of the Tennessee Public Service Commission, Hon. Cayce Pentecost, who was questioned at length regarding the Commission's procedure in assessing petitioner's properties. He stated that the final assessment by the Commission was on a basis of judgment, arrived at individually and collectively by the three Commissioners. He at first affirmed and then seemed to qualify the assertion that, in placing a value on petitioner's system, the Commission took into consideration the fact that local assessors usually assessed properties at less than one hundred percent (100%) of actual cash value.

He testified:

"Q. State whether or not the Commissioners collectively and individually attempt to arrive at a fair judgment as to what value should be placed on the railroad properties for assessment of ad valorem taxes?

A. We do."

He then stated that the Final Public Service Commission assessment of $47,875,000.00 was intended to repre-

sent one hundred percent (100%) cash market value of the properties of the petitioner in Tennessee.

By stipulation, all four cases were consolidated and the responses filed in the 1964 appeals were treated as responses to the 1965 petitions for certiorari.

The State Board in its order of November 24, 1965, found that petitioner had shown by uncontradicted proof that the basis of assessments of the properties other than those of railroads and public utilities in the counties in question by the tax assessors of those counties, was in the neighborhood of ten percent (10%) of actual cash value.

With respect to the assessments of petitioners' property for the years in question, the Board in its order observed that, while the appellant contended that the Public Service Commission had assessed its property at one hundred percent (100%), the proof in the 1964 appeal tended to show that appellant's properties were assessed at approximately sixty to seventy percent (60-70%) of actual cash value, such ratio being arrived at by processes referred to as "factoring for safety" and "judgment factor". The Board observed, however, that, whether it accepted the appellant's contentions or not, it appeared obvious that the appellant had failed "to carry the burden of showing that its property is assessed at more than its actual cash value".

The order then stated that the Board felt constrained to point out its acute awareness of the gravity of the problem posed by widespread under-assessment of non-utility properties in Tennessee, and that the situation was such as to demand that prompt steps be inaugurated to correct the disparity which everyone concedes to exist in most localities as between assessments of utility and

non-utility properties. It also stated that it recognized, further, that the matter may well, and possibly should, command the attention of the General Assembly since it was of deep concern to the entire citizenry, for its potential impact upon almost every property owner in the State and that, unless orderly measures are taken, the potential effect upon the great majority of the county and municipal governments could be financial chaos.

## III

## OPINION OF THE CHANCELLOR

The opinion of the Chancellor, after reciting that the causes were before that Court on petitions for certiorari from the orders of dismissal entered by the Board of Equalization of the State went on to say:

"The uncontradicted proof is that properties assessed by the County Tax Assessors of Hawkins and Loudon Counties in the years 1963 and 1965 were assessed at about ten (10%) percent of their 'actual cash value'. The State Board of Equalization having certified the value of petitioner's property for the years 1963 and 1965 to the Public Service Commission, it is presumed, and the Court finds, that petitioner's property was assessed at its 'actual cash value' as is required by law. (T.C.A. secs. 67-918, 928 and 929)."

The opinion recites the proceedings before the County and State Boards of Equalization and quotes Article 2, Section 28 of the Constitution of Tennessee, which provides that all property shall be taxed according to its value, such value to be ascertained as the Legislature shall direct, so that taxes shall be equal and uniform throughout the State.

The opinion quotes Section 67-107, T.C.A., which declares it to be the legislative intent that this title be liberally construed in favor of the jurisdiction and powers conferred upon the Commissioner of Finance and Taxation and the State Board of Equalization, who shall ''exercise all such incidental powers as may be necessary to carry out and effectuate the objects and purposes of the title, to equalize the assessment of all properties subject to taxation.'' Section 67-605, T.C.A. is also quoted.

It provides that all property be assessed at its actual cash value. And Section 67-801, T.C.A., which prescribes the duties of the County Boards of Equalization and reiterates that actual cash value is basis for assessments in Tennessee.

Section 67-804, T.C.A. provides the right of property owners to make complaint before the County Board of Equalization. Sections 67-821 and 67-822, T.C.A. provide that the Board of Equalization shall receive and consider all complaints and reports made to it, together with evidence submitted therewith, and shall equalize, compute and fix the value of all such properties within its jurisdiction by the standard of actual cash value, and for said purposes the Board shall have the power and it is made its duty to reduce or increase values of property so that the values of all assessments when so equalized shall conform with said standard of actual cash value.

The Chancellor's opinion concludes:

''The legislature has not vested this Court with the authority to assess the value of property for taxation. This is an administrative function. In these causes the jurisdiction of this Court is 'supervisory' and not 'appellate', [State ex rel. McMorrow v. Hunt] 137

64

Tenn. 243, 250, [192 S.W. 931]; [McCord v. Nashville, C. & St. L. Ry.] 187 Tenn. 277, 286, [213 S.W.2d 196,] and is limited to a determination of whether or not the State Board of Equalization acted illegally, arbitrarily or fraudulently.

The Court is of the opinion that there is no basis under the laws of the State of Tennessee for the assessment of property at less than its 'actual cash value', and, therefore, since the County Tax Assessors of Hawkins and Loudon Counties made assessments of the properties in said counties at less than 'actual cash value', said assessments are illegal and void and it was the duty of the Boards of Equalization to function as provided by law.

The Court is further of the opinion that the orders of the State Board of Equalization dismissing the appeals in the respective causes are also illegal and void, because the Board failed to carry out the mandate of the law requiring that all property of every kind shall be assessed at its 'actual cash value.'

Decree accordingly.''

IV

Taking up the assignments in the order in which they appear in the brief of counsel for appellants, we find *Assignment No. 1* raises the question whether the railroad's ad valorem property tax assessments for 1963-64 and 1965-66 were at less than actual cash value.

Counsel for the railroad in discussing this question emphasizes that they do not admit, but emphatically deny, that in order to obtain relief under Section 67-821, T.C.A., petitioner must show that its properties are assessed at

or above one hundred percent (100%) of actual cash value, it being admitted that this would be necessary if petitioner was seeking a reduction in its own assessment, which is not the relief sought here. The relief sought before the County Boards of Equalization and the State Board and in the petitions for certiorari is that the assessments of the locally assessed properties in Hawkins and Loudon Counties be raised to the level of petitioner's assessment.

In support of the proposition maintained by petitioners that the properties of the railroad were assessed by the Public Service Commission at its full cash value, *Robert G. Pruitt,* Tax Commissioner of petitioner, Southern Railway Company, testified that he had attended the hearings before the Tennessee Public Service Commission each two years and the State Board of Equalization hearings relating to petitioner's ad valorem assessments in Tennessee, and explained in detail the various formulae by which these assessments were fixed. He pointed out numerous alleged errors and inconsistencies such as inflated values, that would produce excessive assessments, and he testified that, at these numerous hearings, members of the Tennessee Public Service Commission had repeatedly asserted publicly that it was the duty and intention of the Public Service Commission to assess petitioner's properties at one hundred percent (100%) of actual cash value.

*Dr. Stanley White,* Tax Consultant of the Tennessee Public Service Commission, testified at great length as to the process used in evaluating the railroad property and, in summary, he stated that the effort on the part of him and his staff and the Commission was to arrive at the cash value of the railroad property.

For example, among other things, at Page 27 of the transcript, in answer to a question he said:

"We are trying to determine what we think should be reasonable fair 100% cash value to bring it into the realm, assuming there might be errors * * * we are attempting to bring that into a reasonable concept of cash value."

*Mr. Cayce Pentecost,* Chairman of the Commission, after extensive examination with respect to their assessment of the petitioner's property, on cross-examination, testified:

"Q. What did you arrive at, what figure did you arrive at as actual cash value of Southern Railway properties in Tennessee subject to taxation?

A. Apparently must have been $47,875,000.00.

Q. You intended that figure to represent 100% cash market value, didn't you?

A. Yes, sir."

We are of opinion that the evidence in this record supports the Chancellor's finding, or it certainly does not preponderate against his finding, that petitioner's property was assessed at actual cash value in the sense that it represents the judgment of the Public Service Commission exercised in an effort on the part of the Commission members to perform their statutory duty with respect to the assessment.

In passing upon this question we must bear in mind that the assessment of properties by any Tax Assessor involves the exercise of judgment on his part. No one would argue that the assessment of properties for taxa-

tion by any assessing authority, as we know them, is based on an accurate determination of the actual cash value of those properties, which is to say, that, even if the assessors in the respective counties and the Boards of Equalization attempted to arrive at the actual cash value of properties it would still be a matter of opinion or judgment and not subject to any high degree of accuracy.

In regard to the value of the railroad property, numerous factors were taken into consideration as was explained by Mr. White and by the other witnesses, including Chairman Pentecost, so that in no sense was it ever intended that these values be fixed by the Commission with precision as to value. Therefore, when the Tax Consultant, Mr. White, and Chairman Pentecost testified that they attempted to arrive at a fair cash value we must accept that as being true unless it can be clearly demonstrated that they purposely did otherwise.

Hence, the First Assignment is overruled.

The *Second Assignment* to the effect that the Chancellor erred in holding that petitioner had standing to maintain this action in the face of a showing that its properties were assessed at less than true value, of course is answered by the conclusion reached as to Assignment No. 1. However, since counsel so earnestly argued this point and it is answered in detail by counsel for the petitioners, we will discuss it briefly.

As is seen hereinabove, the State Board found and the Chancellor agreed that, by uncontradicted proof, it was shown that the basis of assessments of the properties in the Counties in question other than railroad and public utilities was at or about ten percent (10%) of actual cash value. Thus, even if we accept the contention of the

appellants that the assessment of petitioner's property was at substantially less than one hundred percent (100%), there is still the fact of a disparity between the petitioner's assessment and those of the local property owners of at least five or six to one. The Board said its current experience indicates that the level of assessments in some localities is considerably less than ten percent (10%). Nevertheless, counsel for appellants insists that both the State Board of Equalization and the Courts are powerless to eliminate this discrimination and that in the case at bar this is true particularly because the petitioner has failed to show that its properties are assessed at more than actual cash value or at actual cash value.

Appellants rely heavily on Carroll v. Alsup, 107 Tenn. 257, 64 S.W. 193, which they say holds that no taxpayer has standing to complain of his neighbor's assessment until he can show that his own property is fully assessed. We think Carroll v. Alsup is distinguishable from the case at bar in several important particulars. It was not a suit to obtain a reduction in Carroll's assessment or an increase in the inadequate assessment of his neighbor. On the other hand, it was a suit to recover State and County taxes paid under protest on the ground that they were illegally assessed and collected because (1) his property was assessed at 90% of actual cash value whereas other properties in the County were assessed at 75%, 60% and 40% of value, and (2) because the State Board of Equalization had, without notice to him, increased his assessment from $10,000.00 to $10,500.00.

It is pointed out by counsel for the appellee that on this first issue the Court held that because Carroll's neighbor's property was assessed at a lower percentage of actual cash value than his own did not render Carroll's

assessment illegal and that in order for Carroll's assessment to be declared illegal he must show that it exceeded actual cash value. The Court said in the course of the opinion that it was the evident policy and object of the law in cases of unequal assessment, not to reduce assessments on property unless it had been assessed beyond its actual value but instead to raise up to that valuation all property that had been inadequately assessed and, thus, to equalize taxation on all property; that the recourse offered to the taxpayer was not to reduce his own assessment unless it was beyond its actual cash value, but to have that of his neighbor increased until both reached the point of actual cash value and, thus, become equal and uniform.

The Court further stated:

"It is no ground for relief to him, nor can any taxpayer be heard to complain of his assessments, when it is below the actual cash value of the property, on the grounds that his neighbor's property is assessed at a less percentage of its true or actual value than his own. * * * He may come before an equalizing board, or perhaps before the courts, and show that his neighbor's property is assessed at less than its actual value, and ask to have it raised to his own, if his is at cash value, and in this way the courts, legislatures and taxpayers will co-operate to tax all property at its actual cash value, and to make all taxes equal and uniform, as the constitution contemplates."

As is argued by counsel for appellees, it is to be noted that the above language is dealing solely with the question as to when a taxpayer may complain of his own assessment and seek a reduction of it and that this

remedy is available only in the event the assessment exceeds actual cash value.

It is pointed out by counsel for appellants that Carroll v. Alsup has been cited with approval in several later cases. However, an examination of these cases shows that in each instance it was cited to support the proposition that a taxpayer may not obtain a reduction in his own assessment unless he can prove that his assessment exceeds actual cash value.

Looking at Section 67-821, T.C.A., it would seem that this statute affords a taxpayer relief in the event:

(1) other property than his own has been assessed at less than actual cash value, or (2) has been assessed at less percentage of actual cash value than his own, or (3) if his own property has been assessed at more than its actual cash value.

It is further pointed out that this is apparently the first time this kind of relief has been sought under Section 67-821, T.C.A., insofar as reported Tennessee decisions reveal, but that such relief has been granted in recent years in several sister States, citing Russman v. Luckett (June 8, 1965) Ky., 391 S.W.2d 694, and Walter v. Schuler, Fla., 176 So.2d 81. The latter is a taxpayers' suit where the Court ordered a reassessment of all taxable properties in the State of Florida at actual cash value, as did the Court in the Kentucky case hereinabove cited. Counsel also cite McLennan v. Undercofler (August 31, 1965) decided by Fulton County, Georgia, Superior Court in which re-assessment of properties was ordered by that Court and the appeal dismissed on technical grounds.

*Assignment No. 3* complains of the action of the Chancellor in holding that a Board of Equalization is empowered in non-assessment years to entertain an action by a petitioner to raise assessments other than his own.

██ It is to be noted that Section 67-201, T.C.A. provides that the State Board of Equalization "[S]hall meet in the office of the commissioner of finance and taxation, annually on the second Monday in August. * * * Said sessions shall continue from time to time and day to day, until the equalization of all assessments is completed." Section 67-821, T.C.A., gives any taxpayer the right to petition the State Board of Equalization for relief if the property of others is assessed at a less percentage of actual value than his own property and we do not find that this section limits the exercise of this jurisdiction to "odd years" nor do we find such limitation in any of the other provisions of the statutes.

In view of the declaration of legislative intent contained in Section 67-107, T.C.A., where it is said "[T]his title [shall be] liberally construed in favor of the jurisdiction and powers conferred upon the commissioner of finance and taxation; and upon the state board of equalization. The commissioner and/or board shall have and exercise all such incidental powers as may be necessary to carry out and effectuate the objects and purposes of this title, to equalize the assessment of all properties subject to taxation", we are inclined to the view that the restriction insisted upon by counsel for the appellant should not be applied by the Courts since there is no specific language in the statute to support such a limitation.

It is further pointed out by counsel for the petitioner that the language of Sections 67-821 and 67-822, T.C.A.

requires the taxpayer to allege and prove that his property is assessed at a greater percentage of actual cash value than other taxable properties in the County, and, under Section 67-212, T.C.A., the County Boards of Equalization are required to meet on the First Monday of May in each odd year for the purpose of finalizing the assessment of all locally assessed properties with their work to be completed by the First Monday in August. On the other hand, under Section 67-926, T.C.A., the Tennessee Public Service Commission does not make its tentative recommendation with respect to railroad assessments until the First Monday in August of each odd year, and the State Board of Equalization does not finalize and certify the railroad and utility assessments until the Third Monday in October of each odd year. Therefore, in an odd year a railroad company or public utility has no assessment of its property upon which to act until long after the County Boards of Equalization have met and adjourned.

While counsel for the respondent argue with some force that the railroad or utility involved is not prevented from appealing to the State Board because of the foregoing limitations, we think the fact that it would severely hamper them in any attempt to appear before the State Board, if it did not actually prevent such appearance in odd years, argues well for the point that the Court should not place such construction on this statute as is contended for by the respondent. Therefore, Assignment No. 3 is overruled.

As to *Assignment No. 4* which raises the question whether the State Board of Equalization has the authority to increase the assessment level in an entire county in the absence of notice to all affected property owners,

counsel for petitioner cites Carroll v. Alsup, supra, as supporting petitioner's position in this matter.

One of Carroll's allegations was that his assessment was void because it had been increased by the State Board of Equalization without notice to him. It is pointed out that the Act in effect when Carroll v. Alsup was decided in 1901 contained provisions similar to Sections 67-821 and 67-822, T.C.A., affording a taxpayer the right to complain that his property was assessed at a higher percentage of actual cash value than that of his neighbor.

The Act in effect at that time (Section 39, Acts of 1899) provided that the Board of Equalization hold biennial sessions at the State Capitol, commencing on the Second Monday in July of each year, to be known as "equalizing sessions" of the Board and that taxpayers and property owners without further notice than the Act itself, were required to take notice of those biennial sessions. In Carroll v. Alsup, supra, the Supreme Court held that the above statute, complied with the requirements of due process and that no further notice to the individual taxpayer was required. After noting that there was respectable authority contrary, the Court went on to hold that tax proceedings, especially assessments, are sui generis and do not require the strictness required in controversies between individuals and that the great preponderance of authority is to the effect that if a public statute, of which all persons are bound to take notice, specifies the day and place when the Board of Equalization shall meet, a person affected by its action cannot complain that such action was taken without notice to him. Also see State Railroad Tax Cases, 92 U.S. 575, 579, 609, 23 L.Ed. 663.

It is to be noted that Section 67-201, T.C.A. provides:

"The state board of equalization shall meet at the office of the commissioner of revenue, annually on the second Monday in August."

It also provides that the meetings may be held in other parts of the State upon publication through the press of the time and place thereof and that:

"Taxpayers and property owners without further notice than this statute, and due publication of the times and places of the meeting of the board as required herein are charged with notice of said session."

The State Board of Equalization, pursuant to statutory authority has adopted "Rules and Regulations of Practice and Procedure", and Rule 4(d) requires that any party filing a petition before the State Board shall serve a copy thereof on such person who would logically be expected to have an adverse interest as a result of being the official or elected representative of citizens who would be affected by the action of the Board, one exact copy to be furnished the Chief Executive Officer, the Chief Assessing Officer or Chairman of the Equalization Board in the county or city where the appeal originates.

■ The record here discloses that copies of the petitions filed with the State Board of Equalization and the petitions for writs of certiorari filed in the Court below were served on the County Judge, the Tax Assessor and the Chairman of the County Board of Equalization of Hawkins and Loudon Counties, which we think was sufficient to comply with the law.

It results that Assignment No. 4 is overruled.

We judicially know that the taxing authorities of the Counties and other divisions of the State government

fix the tax rate based on assessments already made so as to produce revenue requisite to the needs of government in those counties or governmental units.

Hence, it must be presumed that taxes have been collected on the assessments made for the bienniums 1963-1964 and 1965-1966, and the proceeds budgeted and allocated or expended for the operational needs of the respective counties or governmental units.

Although we find that the complainant railroad is entitled to the issuance of Writs of Certiorari and Supersedeas and to relief under the prayers of the petitions we also judicially know that it would probably be extremely disruptive and perhaps result in much hardship to taxpayers and chaotic confusion among public taxing authorities if long established assessment practices and tax rates based thereon be suddenly voided and new and higher assessments mandatorily required and put into effect as to past years.

■ As was pointed out in Hewgley v. Trice, 207 Tenn. 466-473, 340 S.W.2d 918, 921, " 'The issuance of the common law writ of certiorari is a discretionary matter and not to be issued as a matter of right. City of Knoxville v. Connors, 139 Tenn. 45, 201 S.W. 133.' Helton v State, supra, 194 Tenn. 299, 301, 250 S.W.2d 540.''

■ Therefore, in our discretion, we will enter a decree here affirming the Chancellor in his findings of fact and conclusions of law but will modify his findings and decree to the extent that it will not operate retroactively so as to require reassessment of taxes for past years that have already been acted on and revenue requirements met, but the decree will be effective as to all future assessments.

As the record stands now, we do not find that the complainant railroad will suffer loss or be prejudiced by this action since this is not a suit to recover taxes paid under protest and the record does not reveal any such action.

It results that the assignments are overruled and the judgment of the Chancellor affirmed as modified.

Modified and affirmed.

Humphreys and Puryear, JJ., concur.